United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DORA GALINDO, et al.,

          Plaintiffs,

    v.

CITY OF SAN FRANCISCO, et al.,

          Defendants.

Case No.  3:21-cv-08133-JSC

**ORDER RE: DEFENDANTS' MOTION FOR SUMMARY**

Re: Dkt. No. 54, 55, 66

On October 10, 2020, San Francisco Police Officers shot and killed Cesar Vargas.  Dora Galindo, Juan Antonio Vargas, and Rocio Anel Vargas, the mother, father, and sister of Mr. Vargas, sue San Francisco Police Officer Kyle Roach and Sergeant Nicholas Delgado[1] and the City and County of San Francisco on behalf of themselves and as successors in interest to Mr. Vargas.  Plaintiffs allege the officers violated Mr. Vargas's constitutional rights, were negligent under state law, committed an assault against him under state law, intentionally inflicted emotional distress on Mr. Vargas, and violated his rights under California Civil Code § 52.1 (the Bane Act) by using unlawful force.  Defendants move for summary judgment on all claims.

**FACTUAL BACKGROUND**

At approximately 11:29 p.m. on October 10, 2020, Officer Delgado and Officer Roach responded to a call for service in their patrol car.  (Dkt. No. 55-11 ¶ 3.)[2]  The dispatcher informed the officers there was an attempted carjacking with a knife and the victim was located at the

---

[1] Sergeant Nicholas Delgado was promoted after the events giving rise to this case.  So, when discussing the incident that occurred on October 10, 2020, the Court will refer to Sergeant Delgado as "Officer Delgado," since that was his title at the time.

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.  When citing to a video, the time indicates the video timestamp.

United States District Court
Northern District of California

Travelodge near the intersection of Market Street and Valencia Street.[3]  (Dkt. Nos. 55-8 at 8; 55-11 ¶ 4.)   On the way to the scene Officer Delgado told Officer Roach, "[A] knife had been held to the victim's throat."  (Dkt. No. 55-9 at 11.)  Dispatch also provided a physical description of the suspect.  (Dkt. No. 55-11 ¶ 4.)

The Officers arrived at the Travelodge at approximately 11:32 p.m.  (Dkt. No. 55-11 ¶ 5.)  The remainder of the incident is captured on the body cameras of Officer Delgado and Officer Roach.  (Dkt. Nos. 55-6 (Officer Delgado body camera recording); 55-7 (Officer Roach body camera recording).)

A security guard from the Travelodge pointed in the direction of the suspect and told the officers the suspect "has a knife."  (Dkt. Nos. 55-11 ¶ 5; 55-6 at 0:33.)  The officers spoke with another witness who said, "the suspect ran" and gave a description of Cesar Vargas.  (Dkt. No. 55-6 at 1:10.)  The witness also told the officers, "he has a knife also that he held to her throat and our employee is chasing after him."  (*Id.* at 1:20.)  The officers asked if the witness knew where the employee was, and the witness said, "he ran that way."  (*Id.* at 1:30.)

The officers then drove a bit further and found the Travelodge employee who was chasing after Cesar Vargas.  The officers asked the employee, "where's he at?" and then an officer said, "oh I see him, he's running."  (*Id.* at 1:50.)  At that point, the officers turned on their sirens and an officer said, "it's going to be a full pursuit," as the officers sped up and followed Cesar Vargas as he ran. (*Id.* at 1:55.)

The officers followed Mr. Vargas from Colton Street to Brady Street and then to Otis Street.  (Dkt. No. 55-11 ¶ 9.)  After the officers followed Mr. Vargas onto Otis Street, Mr. Vargas stopped running and "slowed to a walk or jog."  (Dkt. Nos. 55-9 at 16; 55-11 ¶ 9.)

While following Cesar Vargas, Officer Roach said, "be careful, I think he has that knife in his right hand."  (Dkt. No. 55-6 at 2:30.)  Officer Delgado responded, "I think he dropped it."  (*Id.* at 2:33.)  The officers then exited the car.  (*Id.*)  As they exited, the officers shouted "get on the

---

[3] Defendants provide surveillance videos of the alleged carjacking.  (Dkt. No. 55-17-18.)  Plaintiffs do not object to these exhibits.  However, because there is no evidence the officers saw these videos or knew of their contents at the time of the shooting, the Court does not consider these videos as part of its analysis.

2

United States District Court
Northern District of California

1   ground right now." (Dkt. Nos. 55-6 at 2:40; 60-8 at 3.)  The officers then ran towards Cesar

2   Vargas, chasing him, as Mr. Vargas ran away.  (Dkt. No. 55-6 at 2:40.)  As they chased Mr.

3   Vargas, the officers continued yelling "get on the ground right now" and "let me see your hands,"

4   "give me your hands."  (*Id.*; Dkt. No. 60-8 at 3.)  Mr. Vargas then slowed to a walk and, from the

5   video, it appears one officer pointed his flashlight toward Mr. Vargas, illuminating him.  (Dkt. No.

6   55-6 at 2:40.)  Cesar Vargas was in view of the body cameras as he continued to walk away from

7   the officers.  (*Id.*)  Then, after a moment, Mr. Vargas slowly turned to face the officers, while

8   continuing to walk away from them.  (*Id.*)  From the video, it is apparent at this point Cesar

9   Vargas is holding something in his right hand.  (*Id.*)  Officer Roach later testified the officers were

10  approximately 40 or 50 feet away from their car when Mr. Vargas turned toward them.  (Dkt. No.

11  55-9 at 18.)  The officers also testified it was at this point they realized Mr. Vargas still had a

12  knife.  (*Id.* at 20; Dkt. No. 55-11 ¶ 11.)  The officers said to Mr. Vargas "what have you got,"

13  "what do you got, man," "give me your hands," "give me your hands," "go ahead, drop it," "drop

14  it," "what do have?," "drop it," "get down on the ground," "hey, put the knife down.  Put the knife

15  down."  (Dkt. Nos. 55-6 at 2:40; 60-8 at 3.)

16       Cesar Vargas did not drop the knife but continued walking a couple steps away.  (*Id.*)

17  Then, Mr. Vargas turned to face the officers and started running toward Officer Delgado.  (*Id.* at

18  2:50.)  Later analysis demonstrated at the time Cesar Vargas started running toward Officer

19  Delgado, Officer Delgado was approximately 24.3 feet away from Cesar Vargas.  (Dkt. No. 55-23

20  at 13.)  As Cesar Vargas ran toward Officer Delgado, Mr. Vargas yelled something—while it is

21  somewhat inaudible on the video, Officers later described him as saying, 'I'm going to fucking kill

22  you,'" or "Bitch I'll kill you n****."  (Dkt. Nos. 55-9 at 18; 55-11 ¶ 12; 55-1 at 2:55; 60-8 at 3

23  (transcript of Officer Delgado's body worn camera indicating Mr. Vargas stated "Bitch I'll kill

24  you, n****").)  The officers said, "get back" twice, but Cesar Vargas continued to run toward the

25  officers with the knife in his hand.  (Dkt. No. 55-6 at 2:55.)

26       Shortly after Cesar Vargas started running at Officer Delgado, Officer Delgado fired his

27  gun at Cesar Vargas.  (Dkt. No. 55-23 at 13.)  Later analysis indicates at the time Officer Delgado

28  fired his weapon, Cesar Vargas was approximately 16.4 feet away from Officer Delgado.  (Dkt.

No. 55-23 at 13.)  Officer Roach also fired at Cesar Vargas.  In total, Officer Delgado fired his weapon twice and both of his bullets were recovered from Cesar Vargas.  (Dkt. No. 55-23 at 6.) Officer Roach fired his weapon three times and one of his bullets was recovered from Mr. Varas. (*Id.*)  After the officers shot Mr. Vargas, Mr. Vargas fell face down on the ground.  (Dkt. No. 55-6 at 3:00.)  Other officers arrive shortly after Mr. Vargas was shot.  (*Id.*)  Officers commanded Mr. Vargas to "put your hands out," and told him, "we want to help you, but we can't do it until you put your hands out," and "let us render aid."  (*Id.*)

Cesar Vargas remained on the ground, unmoving.  (*Id.*)  Officers then approached Mr. Vargas and attempted to render aid (*id.* at 5:30), but he died at the scene.  Officers found a broken knife under his body.  (Dkt. No. 55-20.)

## OBJECTIONS

Plaintiffs object to any evidence of Cesar Vargas's history of mental health issues (or lack thereof) prior to the shooting as irrelevant because the information "has no bearing on what the officers were thinking at the time and is not something they could have found out at the scene." (Dkt. No. 57 at 11-12.)   The Court grants this objection and will not consider any evidence about Cesar Vargas's mental health prior to the night he was killed.

Defendants object to any testimony from Plaintiffs' retained police practice expert, Roger Clark, that Mr. Vargas was "off the rails," or other testimony from Mr. Clark as to Mr. Vargas's mental state.  Roger Clark admitted he "would not be qualified" to make an opinion as to a "diagnosis" for Cesar Vargas.  (Dkt. No. 61-1 at 33.)  So, the Court will not consider Mr. Clark's testimony as evidence of any diagnosis Mr. Vargas has and will only consider his opinions as to how Mr. Vargas's actions and behavior would have impacted proper police response.

## DISCUSSION

"Summary judgment is proper where the movant shows, by citation to the record, that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021).  The Court "view[s] the facts in the light most favorable to the nonmoving party."  *Id.* (quoting *Tuuamalemalo v. Greene*, 946 F.3d 471, 476 (9th Cir. 2019) (per curiam)).

United States District Court
Northern District of California

I.       DEFENDANTS' ADMINISTRATIVE MOTION TO STRIKE

Defendants move to strike Plaintiffs' supplemental material.  (Dkt. No. 66.)  The Court DENIES this motion.  Although the filing was untimely, the Court considers Plaintiffs' arguments.

II.      DEFENDANTS' ADMINISTRATIVE MOTION TO FILE UNDER SEAL

Defendants move to seal two exhibits.  (Dkt. No. 54.)

First, Defendants move to seal San Francisco Department of Emergency Management Computer-Aided-Dispatch ("CAD") printout (Dkt. No. 54-4), because it "contains private information of witnesses and disclosure of that information would cause an unwarranted invasion of personal privacy" and "is protected by the official information privilege" as its publication could reveal the identities of witnesses.  (Dkt. No. 54-1 ¶ 3.)  Plaintiffs filed a redacted version of the CAD printouts in support of their opposition, which is now sealed as Defendants assert the redactions were incomplete.  (Dkt. No. 60-5.)  The motion to seal the redacted portions is GRANTED.  Defendants are ORDERED to file a properly redacted CAD printout in 7 days.

Defendants also seek to file under seal a San Francisco Police Department, Report of Laboratory Examination, (Dkt. No. 54-3), because "report contains private medical information of decedent Cesar Vargas, and making it public would constitute an unwarranted invasion of his rights to personal privacy."  (Dkt. No. 54-1 ¶ 4.)  However, Defendants confusingly state they "are not filing this report with this Court," and no party relied on this document.  (Dkt. No. 54 at 2.)  Therefore, the motion to seal Docket Number 54-3 is DENIED AS MOOT.

III.     VIOLATION OF CONSTITUTIONAL RIGHT TO BE FREE FROM UNREASONABLE FORCE, 42 U.S.C. § 1983

Plaintiffs' first cause of action, brought under 42 U.S.C. §§ 1983, 1985, and 1988, asserts Officers Roach and Delgado violated Cesar Vargas's First, Fourth, and Fourteenth Amendment Rights.

A.       Fourth Amendment

1.       Standing

"[T]he general rule is that only the person whose Fourth Amendment rights were violated can sue to vindicate those rights."  *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998), *as amended* (Nov. 24, 1998) (citing 42 U.S.C. § 1988(a)).  "In § 1983 actions,

however, the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action." *Id.* "The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action." *Id.*

In California, "a cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable limitations period." Cal. Civ. Proc. Code § 377.20(a). "A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest . . . and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest." Cal. Civ. Proc. Code § 377.30. *See also Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1229 (9th Cir. 2013) ("California's statutory requirements for standing to bring a survival action are stated under California Code of Civil Procedure § 377.30.") The Law Revision Commission comment to section 377.30 explains "[t]he distributee of the cause of action in probate is the successor in interest or, if there is no distribution, the heir, devisee, trustee, or other successor has the right to proceed under this article." Cal. Civ. Proc. Code § 377.30 (citing Cal. Civ. Proc. Code § 377.11 (defining "successor in interest" as "the beneficiary of the decedent's estate or other successor in interest who succeeds to a cause of action")).

### a.   Dora Galindo and Juan Antonio Vargas

According to California law, to proceed as a decedent's "successor in interest" individuals must "execute and file an affidavit or a declaration under penalty of perjury under the laws of this state." Cal. Civ. Proc. Code § 377.32. The affidavit or declaration must include, among other things, the decedent's name, a statement "[n]o proceeding is now pending in California for administration of the decedent's estate," a statement indicating the affiant is the decedent's successor in interest or authorized to act on behalf of the decedent's successor in interest and "[n]o other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding," and a certified copy of the decedent's death certificate. *Id.*

United States District Court
Northern District of California

1    In response to a Court order (Dkt. No. 67), Dora Galindo and Juan Antonio Vargas filed a

2    declaration and Cesar Vargas's death certificate with this Court.  (Dkt. No. 70.)  The declaration

3    indicates Mr. Vargas died intestate.  (Dkt. No. 70 ¶ 7.)  Dora Galindo and Juan Antonio Vargas are

4    Cesar Vargas's parents.  (Dkt. No. 34 ¶ 3.)  California's interstate succession statute indicates if

5    there is not a surviving spouse or children of the decedent, then a decedent's estate passes "to the

6    decedent's parent or parents equally."  Cal. Prob. Code § 6402(b).  So, Dora Galindo and Juan

7    Antonio Vargas are the proper successors in interest for Cesar Vargas.  Moreover, their declaration

8    satisfies the other requirements of California Civil Procedure Code § 377.32.  Therefore, Dora

9    Galindo and Juan Antonio Vargas have standing to pursue their son's Fourth Amendment claim.

10   Granted, Dora Galindo and Juan Antonio Vargas's declaration was filed after the statute of

11   limitations expired.  Their Fourth Amendment claim accrued on the death of Cesar Vargas on

12   October 10, 2020, (Dkt, No. 70 at 3), and is subject to a two-year statute of limitations.  *See*

13   *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018) ("Because § 1983 has no

14   specific statute of limitations, federal courts borrow state statute of limitations for personal injury

15   actions."); Cal. Civ. Proc. Code § 335.1 (California's personal injury statute of limitations is two

16   years); *Quiroz v. Seventh Avenue Center*, 140 Cal. App. 4th 1256, 1277 (2006) (applying

17   predecessor to § 335.1 to survivor claim).  Dora Galindo and Juan Antonio Vargas filed their

18   required declaration on February 16, 2024, more than two years after Cesar Vargas's death.  (Dkt.

19   No. 70.)  So, their declaration is untimely.

20   However, their claims are timely pursuant to the relation back doctrine.  Federal Rule of

21   Civil Procedure 15 states an amendment to a pleading "relates back to the date of the original

22   pleading when: . . . the amendment asserts a claim or defense that arose out of the conduct,

23   transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R.

24   Civ. Pro. 15 (c)(1)(B).  Plaintiffs' Fourth Amendment claims remain the same as the claim in their

25   original pleadings.  Defendants are not prejudiced by Plaintiffs' belated filing of the required

26   declaration.  Therefore, the declaration relates back to Plaintiffs' original complaint, and Dora

27   Galindo and Juan Antonio Vargas's claims on behalf of Cesar Vargas are not barred by the statute

28   of limitations.  *See Hayes v. Cnty. of San Diego*, No. 07CV1738 DMS (JMA), 2014 WL

11878351, at *3 (S.D. Cal. Apr. 3, 2014) (holding the relation back doctrine saved a plaintiff's claims because "[t]he only difference between the claims" in the plaintiff's original complaint and after plaintiff filed the required declaration is that the plaintiff "has now submitted the requisite declaration under California Code of Civil Procedure § 337.32," and therefore the defendants "cannot, and indeed they do not, claim they have been prejudiced by Plaintiff's belated filing of the Declarations").

### b.      Rocio Anel Vargas

Rocio Anel Vargas is Cesar Vargas's sister.  (Dkt. No. 34 ¶ 3.)  California's intestate succession statute indicates if there is not surviving spouse or children of the decedent, then a decedent's estate passes "to the decedent's parent or parents equally."  Cal. Prob. Code § 6402(b). Only "[i]f there is no surviving issue or parent" does the estate pass to the siblings of the decedent. Cal. Prob. Code § 6402(c).

Because Cesar Vargas's parents, Dora Galindo and Juan Antonio Vargas, survived Cesar Vargas, Rocio Anel Vargas is not an intestate successor of Cesar Vargas's complaint.  Moreover, Rocio Anel Vargas has not filed the required affidavit or declaration under California Civil Procedure Code § 377.32.  So, Rocio Anel Vargas is DISMISSED as Plaintiff for the Fourth Amendment claim.

### 2.      Merits

Defendants move for summary judgment, asserting the officers "are shielded from liability for civil damages unless Plaintiff's can overcome the Supreme Court's two-step qualified immunity inquiry."  (Dkt. No. 55 at 20.)  First, the Court "ask[s] whether the facts, viewed in the light most favorable to the plaintiff, demonstrate that the [officers] violated a constitutional right." *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022).  Then, the Court asks "whether that right was 'clearly established' at the time of the alleged constitutional violation."  *Id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)).

### a.      Whether the officers violated a constitutional right

"In evaluating a Fourth Amendment claim of excessive force, [courts] ask whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting

8

them." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  The "analysis must balance the nature of the intrusion upon an individual's rights against the countervailing government interests at stake, without regard for the officers' underlying intent or motivations." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019).  Courts consider the totality of the circumstances, including "(1) the 'severity of the crime at issue,' (2) whether the suspect 'poses an immediate threat to the safety of the officers or others,' and (3) whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight.'" *Peck*, 51 F.4th at 887 (quoting *Graham*, 490 U.S. at 396).  Courts also consider "the availability of less intrusive alternatives to the force employed and whether warnings were given." *Hopson v. Alexander*, 71 F.4th 692, 698 (9th Cir. 2023).  Of the factors, "the 'immediate threat to safety' factor is the most important." *Peck*, 51 F.4th at 877.  However, the Court "must ultimately consider the totality of the circumstances 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396)).  Therefore, "[o]nly information known to the officer at the time the conduct occurred is relevant." *S.R. Nehad*, 929 F.3d at 1132.

### i.    Severity of the Crime at Issue

"The 'character of the offense' committed by the suspect is also 'often an important consideration in determining whether the use of force was justified.'" *Glenn v. Washington Cnty.*, 673 F.3d 864, 874 (9th Cir. 2011) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001)).  In this case, dispatch informed the officers there was an attempted carjacking with a knife. (Dkt. Nos. 55-8 at 8; 55-11 ¶ 4.)  This report was confirmed by witnesses on the scene, who told the officers "a woman had been pulled out of her vehicle" and "a knife had been held to her throat," and who identified Cesar Vargas as the perpetrator.  (Dkt. Nos. 55-9 at 7-8; 55-11 ¶ 8.)  Carjacking is a felony under California law.  Cal. Penal Code § 215.  When, as here, the individual is "suspected of a felony, which is by definition a crime deemed serious by the state," the severity of the crime "strongly favors" the officers. *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003).

Plaintiffs suggest the information the officers learned, or could have learned, at the scene

United States District Court
Northern District of California

lessens the severity of the crime.  Specifically, Plaintiffs assert the crime's severity was lessened because "[t]he car was not gone; it was damaged and stranded on a sidewalk," the victim "did not request medical help" nor did the officers call for medical help, and the officers did not ask the victim or any witnesses for a description of the knife used.  (Dkt. No. 57 at 18.)  Drawing all inferences from the evidence in Plaintiffs' favor, the Court will consider the knife could have been very small and that the victim reported no injuries to the officers.  However, even under Plaintiffs' version of events, Plaintiffs concede the "crime was reported as a carjacking with the use of a knife," and that crime "is not to be taken lightly."  (*Id.*)  The Court agrees: even if no one was injured such that medical attention was required and even if Cesar Vargas did not maintain possession of the car, Mr. Vargas's actions still constitute a felony and were a serious crime.[4]

So, this factor weighs in Defendants' favor, as the crime at issue was a violent felony.

### ii.    Whether Cesar Vargas Posed an Immediate Threat to the Safety of the Officers or Others

"The use of deadly force is only reasonable if a suspect 'poses a significant threat of death or serious physical injury to the officer or others.'"  *S.R. Nehad*, 929 F.3d at 1132-33 (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014)).

Every reasonable trier of fact would have to find that at the time of the shooting, Cesar Vargas posed an immediate threat to the safety of the officers.  The officers told Mr. Vargas to drop his weapon multiple times as they were chasing him. (Dkt. No. 55-6 at 2:40.)   Instead of

---

[4] The government urges consideration of not only the carjacking but also Mr. Vargas's conduct towards the officers, asserting such conduct is "more important[]" because it represents "a crime involving the infliction or threatened infliction of serious harm."  (Dkt. No. 55 at 22 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  In *S.R. Nehad v. Browder*, the Ninth Circuit explained it has "applied" the severity of the crime "factor in two slightly different ways."  929 F.3d at 1136.  The first approach focuses on "the government's interest in apprehending criminals, and particularly felons, as a factor 'strongly' favoring the use of force."  *Id.* (quoting *Miller*, 340 F.3d at 964.)  This approach is consistent with considering the carjacking—a serious, violent felony—as a factor favoring Defendants.  The second approach "use[s] the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied" even though "the danger a suspect posed is a separate *Graham* consideration."  *Id.*  The Court will consider Mr. Vargas's conduct towards the officers under the next *Graham* factor—whether the suspect poses an immediate threat to the safety of the officers or others—rather than this factor, though nothing about the Court's analysis hinges on this approach.

10

following those commands, Mr. Vargas turned toward the officers and started running toward Officer Delgado while armed with a knife. (*Id.*) Moreover, as Cesar Vargas ran toward Officer Delgado, he yelled at the officers. (Dkt. Nos. 55-9 at 18; 55-11 ¶ 12; 55-1 at 2:55.) The officers said, "get back" twice, but Cesar Vargas continued to run toward the officers with the knife in his hand. (Dkt. No. 55-6 at 2:55.) As a result, it was reasonable for the officers to conclude Mr. Vargas posed an immediate threat to their safety. *See Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985) ("[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."); *Sabbe v. Washington Cnty. Bd. of Commissioners*, 84 F.4th 807, 828 (9th Cir. 2023) ("Our case law is clear that when a suspect reaches for a gun or aims a weapon at officers, responding with deadly force does not violate the Constitution.").

Plaintiffs concede once Mr. Vargas ran toward Officer Delgado, "the factor weighs pretty highly for Defendants." However, citing *Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013), Plaintiffs argue that Mr. Vargas was armed and moving toward the officers does not necessarily entitle the officers to summary judgment.

In *Hayes*, an officer arrived at Hayes's home "in response to a domestic disturbance call from a neighbor who had heard screaming coming from the house." 736 F.3d at 1227. Hayes's girlfriend told the officer, "[S]he and Hayes had been arguing about his attempt that night to commit suicide by inhaling exhaust fumes from his car," but there had been no physical altercation between her and Hayes. *Id.* Instead, she was "concerned about Hayes harming himself." *Id.* The officers "decided to enter the house to check on Hayes's welfare." *Id.* Once inside, the officers saw Hayes in the "kitchen area" with his right hand behind his back. *Id.* An officer ordered Hayes to "show [him] his hands." *Id.* Hayes took "one or two steps" towards the officer, then "raised both hands . . . , revealing a large knife pointed tip down in his right hand." *Id.* at 1227-1228. The officer believed "Hayes represented a threat to [the officer's] safety" and shot Hayes. *Id.* at 1228. At the time he was shot, Hayes was "roughly six to eight feet away" from the officer and still holding the knife. *Id.* Just before the shooting, Hayes told the officer, "[y]ou want to take

11

me to jail or you want to take me to prison, go ahead." *Id.*

The Ninth Circuit overturned the district court's grant of summary judgment for the defendants as to the plaintiff's negligent wrongful death claim.  The Ninth Circuit explained it was "undisputed that Hayes had committed no crime, and there is no evidence suggesting that Hayes was 'actively resisting arrest or attempting to evade arrest.'" *Id.* at 1233.  Viewing the evidence in the light most favorable to Hayes, "Hayes appears to have been complying with Deputy King's order to show his hands when Hayes raised his hands and revealed the knife." *Id.*  Moreover, "[a]lthough Hayes was walking towards the deputies, he was not charging them, and had not been ordered to stop." *Id.*  So, the court explained, Hayes "had committed no crime and had followed all orders from the deputies at the time he was shot," and therefore "Hayes's unexpected possession of the knife alone—particularly when he had committed no crime and was confronted inside his own home—was not sufficient reason for the officers to employ deadly force." *Id.* at 1233-34.

*Hayes* does not support a finding of a Fourth Amendment violation based on the undisputed facts here.  First, *Hayes* dealt only with the state law claim and did not address the Fourth Amendment claim, finding the plaintiff lacked standing to bring that claim.  *Hayes*, 736 F.3d at 1229 ("Because it is unclear on the present record whether Appellant has standing to assert survival claims based on her father's constitutional rights, we do not address the district court's further finding of qualified immunity in relation to the alleged Fourth Amendment violations.").  Second, many relevant underlying circumstances in the two cases are different.  In *Hayes* a trier of fact could find the decedent did not charge toward the officers, was willing to be taken into custody, and was not resisting arrest.  No such finding is supported by the record here; instead, it is undisputed Cesar Vargas yelled something at the officers and ran toward Officer Delgado while armed with a knife.[5]  Indeed, in *Hayes*, the Ninth Circuit explained "threatening an officer with a

---

[5] Plaintiffs assert the content of what Mr. Vargas yelled at the officer is a disputed fact because "[i]t is unclear on the body cam what Mr. Vargas says" and the "somewhat inaudible words" make it a disputed fact as to what Mr. Vargas said.  Even though *Plaintiffs* submitted a transcript reflecting Mr. Vargas yelled "Bitch I'll kill you, n****," (Dkt. No. 60-8 at 3), the Court will consider the content of the statement Mr. Vargas made toward the officers to be a disputed fact. However, it remains undisputed that Mr. Vargas yelled something at the officers as he ran towards

United States District Court  
Northern District of California

weapon does justify the use of deadly force." *Id.* at 1234.  Hayes was not a suspect in any crime; Cesar Vargas was suspected of committing a violent felony.  And Mr. Vargas was out on the streets of a city and not inside his own kitchen.  *Hayes* therefore does not change the Court's conclusion that it is undisputed Cesar Vargas posed an immediate risk of safety to the officers.

Plaintiffs argue the officers should have accessed the scene differently, and therefore could have obviated the need for deadly force.  They assert "it was reckless for Delgado to disregard that Vargas had a knife" because Officer Delgado "didn't know for SURE that he had dropped it, but decided to do a foot pursuit and tackle anyway." (Dkt. No. 57 at 24.)  They appear to argue that if Defendants had not mistakenly believed Mr. Vargas no longer had the knife, they would not have left their vehicle and Mr. Vargas would not have posed an immediate danger to them.

But, when considering whether a particular incident violated the Fourth Amendment, courts "generally focus[] on the tactical conduct at the time of shooting. . . though a prior constitutional violation may proximately cause a later excessive use of force." *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021) (citations omitted); *see also Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 426 (2017) (rejecting the "provocation rule," which permitted an excessive force claim under the Fourth Amendment "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation") (cleaned up).  It is undisputed the officers knew Cesar Vargas was armed with a knife at the time they shot Mr. Vargas.  So, at the time of the shooting, Cesar Vargas posed an immediate risk to the officers.  Plaintiffs identify no earlier constitutional violation that proximately caused the officers' use of force.

This factor weighs in Defendants' favor.

### iii.     Whether the Cesar Vargas Was Actively Resisting Arrest or Attempting to Evade Arrest by Flight

Plaintiffs concede "[n]othing shows that Vargas wanted to surrender given the situation he was in, i.e. being chased by a car with two police officers." (Dkt. No. 57 at 21.)  Indeed, once the officers turned on the patrol car's lights, Cesar Vargas ran away from the car. (Dkt. Nos. 55-8 at

them while armed with a knife, as those facts are all captured on the body cameras of the officers.

United States District Court
Northern District of California

1   9; 55-9 at 13; 55-11 ¶ 8.)  Once the officers got out of the car to chase Mr. Vargas he continued to

2   run away, before running toward officer Delgado with a knife.  (Dkt. No. 55-6 at 2:40.)  A

3   reasonable trier of fact could not find Mr. Vargas obeyed the officers' commands or surrendered to

4   the officers.  So, this factor weighs in Defendants' favor.

###                    iv.        The Availability of Less Intrusive Alternatives

6            Plaintiffs argue less intrusive alternatives were available, but the officers did not use such

7   alternatives because they did not appropriately assess the situation.  They assert "[a]t the time they

8   arrived at the scene, Mr. Vargas wasn't harming anyone and hadn't even left the scene."  (Dkt. No.

9   57 at 19.)  So, the officers "had more than enough time and distance to do something other than

10   shoot."  (*Id.* at 21.)  Specifically, Plaintiffs contend "Vargas had run himself into an area that was

11   easy to box off," as it has only two exits and "was not as crowded with people."  (*Id.*)   Plaintiffs'

12   expert asserts the officers should have "deploy[ed] a perimeter" meaning have a "car from the

13   opposite direction" drive up to box in Cesar Vargas in a contained area.  (Dkt. No. 61-1 at 90.)

14   But Plaintiffs do not identify anything in the record that supports the expert's opinion.  How wide

15   was the street?  Were there other cars or pedestrians around?  How would the vehicles have

16   effectively blocked a violent suspect running on foot?

17            Further, the expert also testified he was not quibbling with the officers' decision to leave

18   their vehicle, but only their decision not to use their vehicle doors as a shield.  (Dkt. No. 61-1 at 93

19   ("I'm not critical of them getting out, but they should have used the – the doors for the – the

20   ballistic materials of the doors as a barricade."), 99 ("I'm not critical of them getting out of the car.

21   I'm critical of them approaching him under these circumstances, whether or not they believed he

22   dropped the knife.").)  Plaintiffs do not reconcile this testimony.  And, it is undisputed the officers

23   did not carry Tasers, (Dkt. Nos. 55-11 ¶ 17; 55-19 ¶ 18), the officers were not trained to use their

24   extended range impact weapon (a bean bag gun) in a foot pursuit, (Dkt. No. 61-1 at 103), at the

25   time the officers left the vehicle no other officers had arrived at the scene, (*Id.* at 90 (explaining

26   another police car arrived at the scene "very close after the shooting" but not before the shooting),

27   92 (Plaintiffs' expert explaining "containment of Mr. Vargas would have been impossible absent

28   other officers responding")), and that the officers had no indication Mr. Vargas was hearing voices

United States District Court
Northern District of California

14

1    or hallucinating.  (*Id.* at 44-45, 47.)  It is also undisputed neither dispatch nor any person at the

2    scene told the officers Mr. Vargas was suffering from any kind of mental health crisis.  (Dkt. Nos.

3    55-11 ¶ 13-14; 55-19 ¶ 14-15.)

4         Moreover, even accepting Plaintiffs' theory the less intrusive alternative of "containment"

5    was available, the officers' failure to use containment does not mean a reasonable trier of fact

6    could find the use of force unreasonable.  "The calculus of reasonableness must embody

7    allowance for the fact that police officers are often forced to make split-second judgments—in

8    circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

9    necessary in a particular situation." *Graham*, 490 U.S. at 396–97.  So, "[o]fficers need not avail

10   themselves of the least intrusive means of responding to an exigent situation; they need only act

11   within that range of conduct we identify as reasonable." *Glenn v. Washington Cnty.*, 673 F.3d

12   864, 876 (9th Cir. 2011).

13        The officers understood Mr. Vargas had recently committed a carjacking while holding a

14   knife to the victim's throat and was walking around the streets of San Francisco armed with a

15   knife.  Plaintiffs' expert acknowledged the area where Cesar Vargas was walking around was

16   generally "highly trafficked." (*Id.* at 91-92.)  So, every reasonable trier of fact would have to find

17   it was reasonable for the officers to seek to apprehend Mr. Vargas as quickly as possible.  (Dkt.

18   No. 61-1 at 89 (Plaintiffs' expert explaining "[t]he necessity for containment" after a crime like a

19   carjacking because "nothing really productive can occur until [the suspect] is stopped").)

20        Moreover, in the Ninth Circuit, while it is an unsettled question as to how much weight to

21   give to officers' failure to employ de-escalation factors, an immediate threat to officers' safety can

22   outweigh any consideration of whether officers employed de-escalation techniques.  *See Est. of*

23   *Strickland v. Nevada Cnty.*, 69 F.4th 614, 619–20 (9th Cir. 2023), *cert. denied*, No. 23-410, 2024

24   WL 71967 (U.S. Jan. 8, 2024) (assuming, without deciding, the fact "the officers failed to employ

25   de-escalation techniques" is relevant under the *Graham* factors).  So, even if the officers failed to

26   employ de-escalation techniques when they should have, that fact alone cannot permit a finding of

27   unreasonable force in this instance.  In *Estate of Strickland*, the Ninth Circuit affirmed the 12(b)(6)

28   dismissal of a Fourth Amendment excessive force claim and emphasized the most important use-

United States District Court
Northern District of California

of-force factor "is whether the suspect posed an immediate threat." 69 F.4th at 620.  The decedent in *Estate of Strickland* was "known to officers as homeless and mentally ill" and "[a]t the time of the incident, it was obvious that he was suffering from a mental health crisis." *Id.* at 619. Moreover, the decedent "was not under suspicion for committing a serious or dangerous crime" and the officers failed to employ de-escalation techniques. *Id.* at 620.  The *Strickland* decedent was carrying "a plastic, airsoft replica gun," and he ignored officers' directions to put down the gun and eventually pointed that gun in the direction of officers. *Id.* at 621.  The Ninth Circuit concluded in these circumstances, "the bulk of the *Graham* factors favor Strickland," but even so, "the immediacy of the threat" the decedent posed to officers "outweigh[ed] those considerations" because "under the totality of the circumstances, it was objectively reasonable for the officers to believe [the decedent] posed an immediate threat." *Id.* at 620-23.

So, even if this factor favors Plaintiffs, it does not necessarily create a jury question on the reasonableness of the force.

### v.    Whether Warnings Were Given

The officers gave Cesar Vargas multiple warnings before shooting him: as the officers exited the car, they shouted "get on the ground right now," as they chased Mr. Vargas they continued to yell for him to get on the ground and show his hands, as Mr. Vargas faced the officers and they saw his knife they commanded him to drop the knife and get on the ground multiple times, and right before shooting the officers told Mr. Vargas to "get back" twice.  (Dkt. No. 55-6 at 2:40.)

Plaintiffs concede the officers warned Mr. Vargas before shooting him, however, Plaintiffs take issue with the tone of the warnings. Plaintiffs assert the warnings were not given "in a calm voice," and "each word was loud, shouted."  (Dkt. No. 57 at 12.)  They argue "tone makes a difference in de-escalation," (*id.*), and cite to the San Francisco Police Department's own policies, which indicate officers should, "when feasible, employ de-escalation techniques to decrease the likelihood of the need to use force during an incident and to increase the likelihood of voluntary compliance."  (Dkt. No. 60-4 at 5.)  However, cases finding warnings insufficient generally focus on the absence of any warning, *see Deorle v. Rutherford*, 272 F.3d 1272, 1283–84 (9th Cir. 2001)

United States District Court
Northern District of California

("The absence of a warning or an order to halt is also a factor that influences [sic] our decision . . . [W]e simply determine that such warnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test."), or find warnings to be inadequate because the warning was inaudible or police deployed force before a suspect could have complied with the warning. *See Nelson v. City of Davis*, 685 F.3d 867, 883 (9th Cir. 2012) (holding officers failed to "give sufficient warnings" when the officers' instructions to disperse could not "be heard over the din of the crowd," and there was "nothing in the record that indicates that the group was told prior to the shooting how they should comply with the dispersal orders (particularly when the officers were blocking their primary means of egress) or that force would be used against them if they did not behave in a particular manner"). Moreover, the officers were many feet away from Mr. Vargas when giving these warnings, so the volume of the warnings was likely necessary to ensure Mr. Vargas could hear the warnings. Further, Plaintiffs' expert in police procedure, Roger Clark, indicated he had no opinion on the warnings the officers gave Mr. Vargas. (Dkt. No. 61-1 at 97.) Given the rapidly evolving situation, a reasonable trier of fact could not find the officers warnings were insufficient.

So, this factor weighs in favor of Defendants.

***

In sum, drawing all reasonable inferences from the record in Plaintiffs' favor, it is undisputed nearly all the factors weigh toward finding the officers acted reasonably. The most important factor, whether Cesar Vargas posed an immediate risk of threat to the officers, weighs in the officers' favor. So, a reasonable trier of fact could not find Defendants used constitutionally excessive force. However, even if a reasonable trier of fact could find excessive force was used, qualified immunity bars Plaintiffs' claims against the officers for the reasons described below.

### b.      Whether the right violated was clearly established

"The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct." *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991). *See also Hopson v. Alexander*, 71 F.4th 692, 698 (9th Cir. 2023) ("Plaintiffs

17

asserting excessive force claims must thus point to an existing rule that 'squarely governs' the facts at issue.") (quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)).  "The 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Peck*, 51 F.4th at 887 (quoting *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021) (per curiam)).  Moreover, "[i]n the Fourth Amendment excessive force context, specificity is especially important, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue."  *Ventura v. Rutledge*, 978 F.3d 1088, 1091 (9th Cir. 2020) (cleaned up).

As discussed above, a reasonable jury could not find Officers Roach and Delgado violated Cesar Vargas's Fourth Amendment rights.  But even assuming a Fourth Amendment violation did occur, Cesar Vargas has not demonstrated any such right was clearly established at the time of the constitutional violation—October of 2020.  In *Ventura v. Rutledge*, the Ninth Circuit held, as of 2015 (the time of the alleged constitutional violation in that case), "no controlling precedent had clearly establish[ed] that [an individual's] right under the Fourth Amendment to be free from the excessive use of deadly force by police would be violated when he was shot and killed as he advanced toward an individual he had earlier that day assaulted, while carrying a drawn knife and while defying specific police orders to stop."  978 F.3d at 1090.  While Cesar Vargas was not advancing "toward an individual he had earlier that day assaulted," and instead was advancing toward police officers, the case is otherwise factually similar to this case.  In *Ventura*, an officer responded to a report of a "violence domestic disturbance."  *Id.* at 1091.  When the officer arrived at the scene, the suspect was not present.  *Id.* at 1090.  The officer started interviewing witnesses, when the suspect "started walking up the street toward the home," ignoring the officer's orders to "stop."  *Id.*  The suspect then "took out a knife from his pocket" and continued to approach the witness the officer had been interviewing.  *Id.*  The officer "shouted a warning . . . to 'stop or I'll shoot," but the suspect did not stop and was within 10-15 feet of the witness.  *Id.*  The officer then shot the suspect, killing him.  *Id.*

Much like *Ventura*, the officers suspected Cesar Vargas committed a violent crime, Mr. Vargas carried a visible knife, the officers warned Mr. Vargas to "drop the weapon" multiple

18

1   times but Mr. Vargas ignored those warnings, Mr. Vargas was approaching the officers, and, at the

2   time of the shooting, Mr. Vargas was a similar distance away from the officers as the *Ventura*

3   decedent was from the witness.  (Dkt. No. 55-23 at 13 (Cesar Vargas was approximately 16.4 feet

4   away from Officer Delgado at the time he was shot).)  Moreover, Cesar Vargas was running

5   toward the officers while the suspect in *Ventura* was walking toward the witness.  *See also Kisela*

6   *v. Hughes*, 138 S. Ct. 1148, 1154 (2018) (holding, as of 2010 in the Ninth Circuit, it was not

7   clearly established the use of deadly force was unconstitutional when the decedent "was armed

8   with a large knife" and was "within striking distance" of another person, and "ignored the officers'

9   orders to drop the weapon," and "the situation unfolded in less than a minute").

10  Plaintiffs have not provided any cases from 2015 to 2020 that change this analysis. The

11  Court has likewise been unable to find any such case.  So, qualified immunity immunizes the

12  officers' conduct.

13  Plaintiffs cite to *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997), asserting

14  officers' "use of force is unreasonable if the officer[s] recklessly got [themselves] into the

15  situation."  (Dkt. No. 57 at 16.)  *Allen* does not defeat qualified immunity.  First, this case is

16  merely persuasive, not controlling on this Court, and therefore this case alone cannot establish

17  "clearly established law."  *See D.C. v. Wesby*, 583 U.S. 48, 63 (2018) ("To be clearly established"

18  the "rule must be settled law, . . . which means it is dictated by controlling authority or a robust

19  consensus of cases of persuasive authority.") (cleaned up).  Second, the facts of *Allen* differ

20  significantly from this case.  In *Allen*, officers received a report "Mr. Allen was armed and had

21  threated family members," and there was a warrant for his arrest for impersonating an officer.

22  *Allen*, 119 F.3d at 839.  Officers later learned "Mr. Allen was threatening suicide."  *Id.*  Mr. Allen

23  was sitting in his car, with a gun in his right hand, as officers approached.  *Id.*  Officers told Mr.

24  Allen to drop his gun, then an officer "reached into the vehicle and attempted to seize Mr. Allen's

25  gun."  *Id.*  Mr. Allen then "swung the gun" toward the officers, and the officers shot and killed Mr.

26  Allen.  *Id.*  The Tenth Circuit explained a trier of fact could fine the officers "ran 'screaming' up

27  to" the decedent's car and "immediately began shouting."  *Id.* at 841.  Because the "entire incident

28  . . . took only ninety seconds," the Tenth Circuit concluded the "officers' preceding actions were

United States District Court
Northern District of California

19

so 'immediately connected' to Mr. Allen's threat of force that they should be included in the reasonableness inquiry," and therefore "a reasonable jury could conclude on the basis of some of the testimony presented that the officers' actions were reckless and precipitated the need to use deadly force." *Id.* (cleaned up).

*Allen* does not put the officers on notice their conduct in this case was reckless, as there are significant factual differences between this case and *Allen*.  *See Waid v. Cnty. of Lyon*, 87 F.4th 383, 392 (9th Cir. 2023) ("Because none of the cases on which plaintiffs rely are sufficiently analogous, we conclude that they cannot put a reasonable officer on notice that the use of deadly force here would be unconstitutional.").  In *Allen*, the officers were aware Allen was threatening suicide, Allen did not threaten or spring towards officers, Allen was not a suspect in a recent violent crime, and Allen was closed off in his car and not walking in a public area towards other people.  *See also Est. of Ceballos v. Husk*, 919 F.3d 1204, 1209 (10th Cir. 2019) (finding no qualified immunity, citing *Allen*, because an officer "shot and killed an emotionally distraught [man] within a minute of arriving on scene," and under the plaintiff's version of facts, the officer "approached" the decedent "quickly" while screaming and "refusing to give ground" as the decedent approached the officers with a baseball bat); *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 10-13 (2021) (finding officers conduct was not unlawful when officers shot a man armed with a hammer after decedent ignored their commands to drop the hammer and decedent "raised the hammer . . . and took a stance as if he was about to throw the hammer or charge at the officers" because *Allen* was distinguishable since "the officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hand").

Plaintiffs again cite *Hayes v. City of San Diego*, but this time to the California Supreme Court opinion on the case, 57 Cal. 4th 622 (2013), for the proposition "liability can arise from the tactical conduct and decisions made by law enforcement preceding the use of deadly force."  (Dkt. No. 57 at 17.)  In *Hayes*, the Ninth Circuit certified a question about California state negligence law to the California Supreme Court, and the California Supreme Court analyzed "[w]hether under California negligence law, liability can arise from tactical conduct and decisions employed by law

1    enforcement preceding the use of deadly force." 57 Cal. 4th at 626.  The Court answered the

2    question in the affirmative, determining, as a matter of California negligence law, negligence

3    "liability can arise if the tactical conduct and decisions leading up to the use of deadly force show,

4    as part of the totality of circumstances, that the use of deadly force was unreasonable." *Id.*

5    However, the California Supreme Court carefully cabined its ruling to state negligence law,

6    explaining "state negligence law . . . considers the totality of the circumstances surrounding any

7    use of deadly force," and therefore "is broader than federal Fourth Amendment law, which tends

8    to focus more narrowly on the moment when deadly force is used." *Hayes*, 57 Cal. 4th at 639;

9    *see also Tabares*, 988 F.3d at 1125 (explaining "California negligence law regarding the use of

10   deadly force" is broader than the Fourth Amendment because California negligence law considers

11   "the officer's pre-shooting decisions" while "[f]ederal law . . . generally focuses on the tactical

12   conduct at the time of shooting, though a prior constitutional violation may proximately cause a

13   later excessive use of force") (cleaned up).

14          Plaintiffs assert, citing *Tabares*, "the issue of reasonableness should go to the jury" and

15   requires consideration of whether "the officers should have known the suspect had mental health

16   issues or at least considered it," based on the officers' training.  (Dkt. No. 57 (citing *Tabares*, 988

17   F.3d 1119.)  But the plaintiff in *Tabares* "appeal[ed] only the state negligence claim," so the Ninth

18   Circuit did not consider whether these same factors are relevant to a Fourth Amendment, as

19   opposed to a California state negligence law claim.  *Tabares*, 988 F.3d at 1122.

20          Plaintiffs' other case citations are also inapposite, as the factual scenarios in those cases

21   differ significantly from the factual scenario in this case, and many of the cases find no

22   constitutional violation at all.  *See Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1046-

23   47 (9th Cir. 2014) (reversing summary judgment decision because "it [could not] be established as

24   a matter of law whether or not reasonable suspicion existed to justify the investigatory detention"

25   during a traffic stop where suspect was held "at multiple gunpoints, handcuffed, and directed to

26   her knees"); *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1170 (9th Cir. 2013)

27   (denying qualified immunity to a group of officers after decedent was shot while "adequately

28   subdued" by officers with his hands "behind his back"); *Hernandez v. City of Pomona*, 46 Cal. 4th

501, 207 P.3d 506 (2009) (holding a "federal judgment" for the defendants on a civil rights claim brought under § 1983 "collaterally estops plaintiffs from pursuing their wrongful death claim, even on the theory that the officers' preshooting conduct was negligent"); *Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1352 (5th Cir. 1985) (holding there was "no constitutional deprivation" because the district court only found "force would have been avoided if" the officer had approached the decedent "as required by proper police procedures," however, "If [the decedent's] movements gave [the officer] cause to believe that there was a threat of serious physical harm, [the officer's] use of deadly force was not a constitutional violation. . . The only fault found against [the officer] was his negligence in creating a situation where the danger of such a mistake would exist. We hold that no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts.").

Finally, at oral argument, Plaintiffs argued "qualified immunity does not protect recklessness," and because a reasonable trier of fact could find the officers acted recklessly, it was not necessary for Plaintiffs to provide a case demonstrating the constitutional violation was "clearly established." But, neither of the two cases Plaintiffs cited for this proposition—*Tennessee v. Garner*, 471 U.S. 1, (1985) and *Graham v. Connor*, 490 U.S. 386 (1989)—carve out such a "reckless" exception to qualified immunity. *Tennessee v. Garner* did not consider the issue of qualified immunity, as the individual officers had already been dismissed from the case and the Supreme Court considered only the issue of the city's liability under *Monell*. *Garner*, 471 U.S. at 5-7 *(citing Monell v. New York City Dept. of Social Services*, 436 U.S. 658, (1978)). *Graham* also did not consider qualified immunity. *Graham*, 490 U.S. at 399 n.12 ("Since no claim of qualified immunity has been raised in this case, however, we express no view on its proper application in excessive force cases that arise under the Fourth Amendment.").

So, Plaintiffs have failed to demonstrate the officers violated a "clearly established right," and therefore the officers' conduct is immunized by qualified immunity. As a result, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' Fourth Amendment claim.

### B.      Fourteenth Amendment

#### 1.      Standing

In *Moreland*, the Ninth Circuit held "[r]egardless of whether [plaintiffs] have standing to assert a Fourth Amendment claim based on [their child's] death, they each may assert a Fourteenth Amendment claim based on the related deprivation of their liberty interest arising out of their relationship with" their child because "[t]his substantive due process claim may be asserted by both the parents and children of a person killed by law enforcement officers." *Moreland*, 159 F.3d at 369. So, Dora Galindo and Juan Antonio Vargas have standing to assert a § 1983 claim based on the Fourteenth Amendment because of their "constitutionally liberty protected liberty interest in the companionship and society of [their] child." *Ward v. City of San Jose*, 967 F.2d 280, 283 (9th Cir. 1991), *as amended on denial of reh'g* (June 16, 1992).

However, Rocio Anel Vargas is Cesar Vargas's sibling, not Cesar Vargas's parent or child. Siblings do not "possess a cognizable liberty interest in their [sibling's] companionship," and therefore siblings are not proper plaintiffs in § 1983 claims asserting a violation of the Fourteenth Amendment based on the liberty interest of familial association. *Ward*, 967 F.2d at 284 ("Neither the legislative history nor Supreme Court precedent supports an interest for siblings consonant with that recognized for parents and children."). So, Rocio Anel Vargas is DISMISSED as Plaintiff as to this claim.

#### 2.      Merits

The Due Process Clause of the Fourteenth Amendment provides that a State may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has held Fourteenth Amendment guarantees "certain substantive rights." *Peck v. Montoya*, 51 F.4th 877, 892 (9th Cir. 2022) (citing *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)). The Ninth Circuit has interpreted these substantive rights to include parents' right "to the companionship of a child, which a police officer violates by 'act[ing] with a purpose to harm' the child 'that [is] unrelated to legitimate law enforcement objectives.'" *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1168–69 (9th Cir. 2013) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)).

1    Plaintiffs assert Defendants violated Mr. Vargas's right of "[f]reedom from a deprivation

2    of liberty without due process of law."  (Dkt. No. 34 ¶ 39.)  Defendants, citing *Peck v. Montoya*,

3    F.4th 877 (9th Cir. 2022), and *Graham v. Connor*, 490 U.S. 386, 388 (1989), assert "the Supreme

4    Court has unequivocally proclaimed that 'all claims that law enforcement officers have used

5    excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of

6    a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard,

7    rather than under a 'substantive due process' approach." *Peck*, 51 F.4th at 892 (citing *Graham*,

8    490 U.S. at 395).  To the extent Plaintiffs are asserting a Fourteenth Amendment survival claim

9    based on the force directed at Cesar Vargas, that claim is foreclosed.  *Id.*

10    However, the Ninth Circuit has interpreted "*Graham* to limit only claims brought by 'the

11    person who claims excessive force was directed at him,' leaving open the possibility of

12    substantive due process claims by a parent or child who claims 'loss of the companionship and

13    society' of the decedent."  *Id.* (quoting *Curnow By & Through Curnow v. Ridgecrest Police*, 952

14    F.2d 321, 325 (9th Cir. 1991)).

15    But Plaintiffs do not plead such a loss of companionship claim.  (*See* Dkt. No. 34.)  Nor do

16    Plaintiffs defend their Fourteenth Amendment claim in their opposition to Defendants' motion for

17    summary judgment.  (*See* Dkt. Nos. 57, 63.)  Moreover, the evidence does not support such a

18    claim.  "To determine whether a violation of substantive due process occurred, we look to whether

19    the officers' conduct deprived [Plaintiffs] of [their] familial interest in a manner that 'shocks the

20    conscience.'"  *Peck*, 51 F.4th at 893 (quoting *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230

21    (9th Cir. 2013)).  "In cases like this, where officers must react quickly to a rapidly changing

22    situation, the test is whether the officers acted with a purpose of causing harm unconnected to any

23    legitimate law enforcement objective." *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123,

24    1133 (9th Cir. 2017); *see also Peck*, 51 F.4th at 893 (explaining the "purpose-to-harm standard"

25    applies when police officers are "confronting a threatening, armed suspect").  Moreover, "the

26    purpose-to-harm standard can apply even where 'the officer may have helped to create an

27    emergency situation by his own excessive actions.'"  *Peck*, 51 F.4th at 894 (quoting *Porter v.

28    Osborn*, 546 F.3d 1131, 1132 (9th Cir. 2008)).  Plaintiffs have alleged no facts indicating "the

United States District Court
Northern District of California

1    officers acted with a purpose of harming" Cesar Vargas "that was unconnected to a legitimate law

2    enforcement objective." *Jones*, 873 F.3d at 1133.  Moreover, as this Court found the officers'

3    actions did not constitute excessive force under the Fourth Amendment, then necessarily the

4    officers' conduct did not "shock the conscience." *See Schwarz v. Lassen Cnty. ex rel. Lassen*

5    *Cnty. Jail*, 628 F. App'x 527, 528 (9th Cir. 2016)("Recovery for a violation of the right to familial

6    association is generally contingent on the existence of an underlying constitutional violation.").

7            So, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' 42 U.S.C. §

8    1983 cause of action based on the Fourteenth Amendment.

9            **C.      First Amendment**

10           "There are two distinct forms of freedom of association: (1) freedom of intimate

11   association, protected under the Substantive Due Process Clause of the Fourteenth Amendment;

12   and (2) freedom of expressive association, protected under the Freedom of Speech Clause of the

13   First Amendment." *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450,

14   458 (9th Cir.), *amended*, 881 F.3d 792 (9th Cir. 2018); *see also Keates v. Koile*, 883 F.3d 1228,

15   1236 (9th Cir. 2018) ("[W]e have held that claims under both the First and Fourteenth

16   Amendment for unwarranted interference with the right to familial association could survive a

17   motion to dismiss.").

18           Plaintiffs do not plead any facts supporting a First Amendment claim in their first amended

19   complaint.  (*See* Dkt. No. 34 ¶¶ 34-43.)  Plaintiffs also do not defend their First Amendment claim

20   in their opposition.  (*See* Dkt. Nos. 57, 63.)  Moreover, while there is no controlling Ninth Circuit

21   case indicating the standards for assessing First Amendment freedom of association claims in this

22   context, courts in this district have assessed First Amendment "familial association claims using

23   the same substantive legal standards" as Fourteenth Amendment familial association claims.  *Est.*

24   *of Sanchez v. Cnty. of Stanislaus*, No. 118CV00977ADABAM, 2023 WL 7612399, at *27 (E.D.

25   Cal. Nov. 14, 2023); *see also Garcia v. Cnty. of Napa*, No. 21-CV-03519-HSG, 2023 WL 355148,

26   at *9, *9 n.14 (N.D. Cal. Jan. 17, 2023) (analyzing the plaintiffs' "loss of familial association

27   claim," brought under both the First Amendment and the Due Process Clause of the Fourteenth

28   Amendment, as one claim rather than as two separate standards).  So, for the same reasons

United States District Court
Northern District of California

1   Plaintiffs' Fourteenth Amendment claim fails, Plaintiffs' First Amendment claim fails.

2                                               ***

3          In sum, the Court GRANTS Defendants' motion for summary judgment as to Plaintiffs'

4   first cause of action, brought under 42 U.S.C. §§ 1983, 1985, and 1988, alleging Officers Roach

5   and Delgado violated Cesar Vargas's First, Fourth, and Fourteenth Amendment Rights.

6   **IV.    REMAINING CLAIMS**

7          **A.    Bane Act Claim**

8          Defendants moved for summary judgment on Plaintiffs' Bane Act claim, California Civil

9   Code § 52.1.  The Bane Act provides "[a]ny individual whose exercise or enjoyment of rights

10  secured by the Constitution or laws of the United States, or of rights secured by the Constitution or

11  laws of this state, has been interfered with" by "threat, intimidation, or coercion," may "prosecute

12  in their own name and on their own behalf a civil action for damages."  Cal. Civ. Code § 52.1(b)-

13  (c).  "The elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim,

14  with the added requirement that the government official had a 'specific intent to violate' a

15  constitutional right."  *Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022) (quoting *Reese v.*

16  *Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018)).

17         Plaintiffs' complaint alleges the officers violated the Bane Act because they "inflicted

18  violence and conspired, aided, abetted and incited the infliction of violence against the decedent

19  Vargas by reason of his national ancestry, ethnic origin and race and thereby harmed each

20  plaintiff."  (Dkt. No. 34 ¶ 67.)  However, Plaintiffs present no evidence the officers were

21  motivated by Cesar Vargas's national ancestry, ethnic origin, or race.  In their opposition,

22  Plaintiffs do not defend their Bane Act claim except to argue the officers' actions "were contrary

23  to the U.S. Constitution 4th Amendment, California Statutes, Police Training manuals (POST), and

24  the General Orders of the City and County of San Francisco through its police department," and

25  the "same arguments apply to the plaintiffs' allegations under the Bane Act."  (Dkt. No. 57 at 6.)

26  Plaintiffs also do not mention or explain their Bane Act claim in their supplemental brief.  Since

27  the Court dismisses Plaintiffs' § 1983 claim, and Plaintiffs have not identified any other

28  constitutional or federal or state law violation on which their Bane Act claim is premised,

United States District Court
Northern District of California

26

1    Defendants' motion for summary judgment on Plaintiffs' Bane Act claim is GRANTED.

2        **B.        Other State Law Claims**

3        Having granted summary judgment as to Plaintiffs' only federal cause of action, the Court,

4    in its discretion, declines to assert supplemental jurisdiction over the remaining state law claims.

5    "A district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims

6    over which it has original jurisdiction.'" *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th

7    Cir. 2010) (quoting 28 U.S.C. § 1367(c)(3)). "[I]n the usual case in which all federal-law claims

8    are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction

9    doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to

10   exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484

11   U.S. 343, 350 n.7 (1988).

12       The Court declines to assert supplemental jurisdiction, finding, after considering judicial

13   economy, convenience, fairness, and comity, the balance of the factors weighs toward dismissing

14   without prejudice the remaining state law claims. Plaintiffs' remaining state law claims require

15   analysis into specific state law and are not resolved by the dismissal of Plaintiffs' federal claims.

16   Both the Ninth Circuit and California Supreme Court have held California's state negligence law,

17   as applied to excessive force cases, is broader than Fourth Amendment law. *See Hayes*, 57 Cal.

18   4th at 639 ("[S]tate negligence law, which considers the totality of the circumstances surrounding

19   any use of deadly force . . . , is broader than federal Fourth Amendment law, which tends to focus

20   more narrowly on the moment when deadly force is used.") (cleaned up); *Tabares*, 988 F.3d at

21   1128 ("California negligence law overall is 'broader than federal Fourth Amendment law' in

22   excessive force cases.") (citing *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252,

23   1257 (9th Cir. 2016)). Plaintiffs' state law claims also implicate state law immunities. *See, e.g.*,

24   *Gilmore v. Superior Ct.*, 230 Cal. App. 3d 416, 420 (Ct. App. 1991) (explaining, in California,

25   "there is no civil liability for a justifiable homicide"). Given that no federal claims remain, the

26   Court declines to decide these issues of purely state law. *See also Tabares*, 988 F.3d at 1131 n.7

27   (explaining, after reversing a district court's grant of summary judgment to the defendant on the

28   plaintiff's state negligence claim "[t]he district court is free on remand to decline to exercise

United States District Court
Northern District of California

supplemental jurisdiction over the state-law claim[ ] and allow plaintiff[ ] to bring [it] in state court," because the district court had previously dismissed the only federal claim) (cleaned up). *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668–69 (9th Cir. 2019) ("We note, however, that because we affirm the dismissal of plaintiffs'" federal "claims, the district court is also free on remand to decline to exercise supplemental jurisdiction over the state-law claims and allow plaintiffs to bring them in state court."); *Trustees of Constr. Indus. & Laborers Health & Welfare Tr. v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 926 (9th Cir. 2003) ("It is thus no surprise that our cases upholding the exercise of discretion under § 1367(c)(3) have all involved dismissals for failure to state a claim or a grant of summary judgment to the defendant on the federal claim. . . In each case, we held that it was appropriate for the district court to decline jurisdiction over the supplemental state claims because the federal claim had proven to be unfounded.").

So, the Court DISMISSES Plaintiffs' remaining state law claims WITHOUT PREJUDICE.

## CONCLUSION

For the reasons discussed above, the Court GRANTS Defendants' motion for summary judgment as to Plaintiffs' first cause of action, brought under 42 U.S.C. § 1983, and Plaintiffs' fifth cause of action, brought under California Civil Code § 52.1 (the Bane Act).  All remaining claims are DISMISSED WITHOUT PREJUDICE.

This order disposes of Dkt. Nos. 54, 55, 66.

**IT IS SO ORDERED.**

Dated: February 27, 2024

_____
JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

28